UNITED STATES of America, Plaintiff,

v.

Howard U. JOHNSON, Defendant.

Crim. A. No. 80–60.

United States District Court,
D. Delaware.

Sept. 22, 1981.

Joseph J. Farnan, Jr., U. S. Atty. and Theopalis K. Gregory, Asst. U. S. Atty., Dept. of Justice, Wilmington, Del., for plaintiff.

Anthony G. Flynn, Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Defendant Howard U. Johnson has been indicted for conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846, and for possession with intent to distribute approximately 51 grams of methamphetamine in

violation of 21 U.S.C. § 841(a)(1). He now moves to suppress evidence obtained in two searches of premises at 712 E. 22nd Street in Wilmington, Delaware. The first search occurred on December 26, 1979, during and after a fire on the premises. The second search took place on January 14, 1980, pursuant to a search warrant issued by a Wilmington Municipal Court judge. Defendant also seeks a bill of particulars to supplement the indictment. Each of these motions will be addressed in turn.

■ Although the government initially disputed defendant's standing to challenge the searches, it conceded standing at the suppression hearing. Testimony presented at the hearing established that some time in 1977, Leroy W. Wilson purchased the property at 712 E. 22nd Street as part of a business arrangement with Albert Nayler and Ronald Billups.[1] Wilson provided the downpayment and Nayler and Billups assisted with settlement costs and were to renovate the house at their expense; the three were to share equally in the profits should the property be sold. Wilson and Nayler resided in the house until mid-1978, when Wilson moved out, and thereafter Nayler resided in the house alone, apparently until he and Billups began renovations in the spring of 1979. Nayler made mortgage payments during this time and the utilities and telephone were in his name.

Nayler and Billups entered into an agreement with the defendant, Howard U. Johnson, whereby Johnson would be permitted to use the premises in pursuit of photographic endeavors and Johnson would provide murals for the house when renovations were complete. Johnson used the house during the summer of 1979 and apparently had a key to the premises. John Coyne, a witness who allegedly assisted Johnson in running a methamphetamine laboratory in the basement, testified that during this time Johnson lived in the house and his personal belongings were on the premises. Coyne and Johnson went their separate ways in August or September of 1979.

On October 1, 1979, a Robert Jefferson allegedly signed a lease to the premises (Government Exhibit No. 1) and purportedly took possession. While there is a conflict in the testimony, there is little credible evidence that Robert Jefferson ever resided in the house. The evidence indicates that if any one resided in the house until the fire on December 26, 1979, it was the defendant. Although both searches turned up papers with the names of Nayler, Wilson, and Johnson on them, the name of Robert Jefferson did not appear on any documents in the house. In addition, Detective Richard Andress of the Wilmington Police Department had received information from an informant on December 20, 1979, that Johnson lived at that address, and a vehicle registered to Johnson was seen at that address twice on that date. After the fire of December 26, neighbors identified Johnson by name and description as the person living in the house. The evidence presented at the suppression hearing demonstrated that Johnson had a reasonable expectation of privacy in the area searched, and thus had standing to challenge the search. *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980).

The first search challenged by defendant occurred on December 26, 1979. On that date, members of the Wilmington Fire Department responded to a call at 10:25 p.m. regarding a fire at 712 E. 22nd Street. When they arrived, they found a fire in the second floor front bedroom. While extinguishing the blaze, firemen performed various other duties that are routinely part of their job, such as ventilating the house, searching for and rescuing victims, and shutting off the utilities. In the course of this activity, firemen discovered what appeared to be controlled substances in the rear bedroom on the second floor. They also searched through a number of papers on the second floor in an attempt to ascertain the owner of the premises because the house appeared to be unoccupied.

1. Because no transcript of the suppression hearing was available at the time that this

opinion was prepared, the facts as set forth are based on notes taken during the proceeding.

Firefighter John C. Wilson, Jr., assisted in extinguishing the fire, and then in his role as fire investigator attempted to determine the cause of the blaze. Although he thought the fire might have been an electrical fire caused by faulty wiring, he did not discount the possibility of arson or burglary because the rooms on the second floor were in disarray, and because both rooms contained valuable photographic and electronic equipment. As part of his investigation he entered the basement to check the wiring and discovered what he originally believed to be a photographic laboratory. Upon returning to the first floor he notified a patrolman, who had responded to the alarm as police routine required, that he had found a large amount of valuable equipment in the basement and that he could not locate the owner of the house. Shortly thereafter a fireman notified him of the discovery of what appeared to be drugs in the rear bedroom on the second floor.

The police officer on duty summoned Sgt. John Trickey of the Wilmington Police Department to the scene shortly after the fire began. The officer notified Sgt. Trickey of the discovery of drugs and a large amount of valuable property in the house. Sgt. Trickey notified Sgt. Edward Head of the Wilmington Police Department who arrived shortly afterward. Both officers went to the basement, but neither was sure of the purpose of the laboratory equipment. At some point the Evidence Detection Unit was called to the scene to photograph what had been found by the firemen.

Approximately two hours after the fire, Detective Richard Andress and Sgt. Ronald Huston of the Vice and Drug Unit of the Wilmington Police Department arrived at the scene of the fire. Detective Andress had also telephonically requested Resident Agent in Charge William F. Glanz of the Federal Drug Enforcement Agency ("DEA") to come to the house. Glanz had placed the house under surveillance some six days earlier. They all entered the basement to observe what the firemen had

found, and Agent Glanz identified the equipment as a disassembled methamphetamine laboratory. They were also shown various items found in the front and rear bedrooms of the second floor. Because of his familiarity with methamphetamine labs and his knowledge of the hazardous nature of some of the chemicals, Agent Glanz assisted the Wilmington police in tagging items as evidence and taking them into custody. Among the items seized in this first search were drugs, laboratory equipment, chemicals, photographs of Johnson, and various papers with the names of Johnson, Nayler and Wilson.

The second search occurred on January 14, 1980, pursuant to a search warrant issued by Judge Alfred Fraczkowski of the Wilmington Municipal Court. Sgt. Huston, Det. Andress, and Agent Glanz conducted the search and seized additional drugs, papers, laboratory equipment, and photographs.

Defendant challenges both searches as having violated his rights under the fourth amendment. He argues that the first search was warrantless and therefore unreasonable because it does not fit into any exception to the fourth amendment.[2] He argues that the second search was illegal because the affidavit underlying the search warrant was invalid, and further claims that the warrant authorized a general search in violation of the fourth amendment.

I.  The First Search

■  A warrantless search is *per se* unreasonable under the fourth amendment. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). The government bears the burden of establishing that the challenged search fell within one of the carefully delineated exceptions to the warrant requirement of the fourth amendment. *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564 (1971); *Katz v. United States, supra*, 389 U.S. at 357, 88 S.Ct. at

---

2.  Defendant also originally challenged the opening of various containers seized during this search. He abandoned this claim at the suppression hearing.

514. Here the government contends that the exigency of the fire justified the warrantless search of the premises on December 26, 1979, and that evidence was then seized in plain view, in compliance with the fourth amendment.

■ A burning building presents an exigency of sufficient proportions to render a warrantless entry reasonable. *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978); *Steigler v. Anderson*, 496 F.2d 793, 795 (3d Cir.), *cert. denied*, 419 U.S. 1002, 95 S.Ct. 320, 42 L.Ed.2d 277 (1974); *United States v. Green*, 474 F.2d 1385, 1389 (5th Cir.), *cert. denied*, 414 U.S. 829, 94 S.Ct. 55, 38 L.Ed.2d 63 (1973). In this case, no one disputes the fact that the firemen's entry of the house was for the sole purpose of extinguishing the fire in the second floor bedroom. They did not need a warrant for this entry, nor did they need a warrant to conduct the routine procedures of searching for and rescuing occupants, ventilating the building, searching for any additional fires, and securing the premises. *Steigler v. Anderson, supra,* at 795. In addition, Firefighter Wilson's warrantless investigation of the cause of the fire was reasonable and justified by exigent circumstances. *Id.* at 797.

■ Once the firemen were legitimately on the premises carrying out their proper firefighting functions, any evidence they inadvertently saw in plain view could be seized without a warrant. *See Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978); *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). The firemen's discovery of what appeared to be drugs and drug paraphernalia in the second floor rear bedroom clearly falls within this exception, because the incriminatory nature of the evidence was apparent and their discovery was inadvertent. *Coolidge v. New Hampshire, supra,* at 466, 469–70, 91 S.Ct. at 2022, 2040. The seizure of various papers with Johnson's name on them was reasonable under the same rationale.

■ Defendant contends, however, that the seizure of laboratory equipment and chemicals from the basement of the house cannot be justified under the plain view doctrine because the incriminating nature of the evidence was not apparent to the firemen or to the Wilmington police officers. It was not until the arrival of DEA Agent Glanz that the items were positively identified as a disassembled methamphetamine laboratory. This argument must fail because although Firefighter Wilson did not know when he first saw the equipment what its purpose was, when he was later notified of the discovery of drugs on the premises he became more suspicious. Items which ordinarily appear perfectly innocent may look incriminating when found in an apparently unoccupied house where drugs had been discovered during a fire of undetermined origin. *See United States v. Callabrass*, 607 F.2d 559, 564 (2d Cir. 1979). The requirement that the incriminating nature of the evidence be immediately apparent is designed to ensure that "the 'plain view' doctrine ... not be used to extend a general exploratory search from one object to another until something incriminating at last occurs." *Coolidge v. New Hampshire, supra,* at 466, 91 S.Ct. at 2022. Here there is no allegation of such an exploratory search. The examination of the equipment by Wilson and other policemen, and the discovery of drugs on the premises, finally culminating in the summoning of the Vice and Drug Unit, indicates a degree of suspicion regarding the character of the laboratory in the basement. The fact that it was somewhat later that the equipment was conclusively identified as a methamphetamine laboratory does not render the search and seizure illegal.

■ Defendant argues further that neither Det. Andress nor Agent Glanz can claim that they obtained evidence in plain view because their discovery was not inadvertent. Defendant asserts that both Andress and Glanz expected to find a drug laboratory on the premises because of the information they received from a confidential informant six days earlier. The Court need not decide whether Andress and Glanz

knew what they would find on the premises because it is irrelevant to the legality of the search. The initial intrusion into defendant's privacy was made by members of the fire department, who by statute have the same law enforcement powers as members of the police department.[3] Their actions of course were governed by the fourth amendment. Having determined that their warrantless search of the house was valid under the fourth amendment, no greater invasion of privacy resulted when officers from the police department arrived on the scene and removed the items from the house. *See Steigler v. Anderson, supra,* at 797–98.

Because of the exigency of the fire, no warrant was needed for the search of December 26, 1979. The items obtained that night in plain view were properly seized and may be admitted into evidence.

## II. The Second Search

The second search took place on January 14, 1980, pursuant to a search warrant issued by a Wilmington Municipal Court judge. Defendant challenges this search on several grounds. First, he alleges that the search was a product of the first illegal search on December 26. Second, he contends that the affidavit underlying the warrant was defective in its presentation of information obtained from a confidential informant. Finally, defendant alleges that the warrant itself was so broad as to constitute a general warrant in violation of the fourth amendment.

■ The first two contentions may be dismissed quickly. First, because the first search was legal, the second search was not the fruit of any illegality. Second, even assuming that the confidential informant did not meet the two-part test developed by the Supreme Court in *Aguilar v. Texas,* 378

U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the informant's information is not necessary to a finding of probable cause. Paragraphs 4 through 8 of the affidavit (Defendant's Exhibit A), which describe what was discovered on the premises on December 26, 1979 and information obtained from neighbors after the fire, present ample probable cause for the search warrant to issue.

The challenge to the warrant itself poses a more troubling question. The warrant is a form warrant, with space to indicate the specific items to be seized.[4] It reads in pertinent part:

You are hereby ordered to search the above named place and/or person(s), with the necessary and proper assistance within ten (10) days of the date hereof, for the following evidence which is specified in the annexed affidavit and application, to wit:

(a) paper, articles or things which are the instruments of a criminal offense and/or designed and/or adopted and/or to be adopted to be used in a criminal perpetration; and/or

(b) property obtained in the commission of a crime; and/or

(c) in particular, *papers that are pertinent in the use in preparing chemicals to use in the manufacturing of illegal drugs, receipts from the purchase of chemicals used in the illegal manufacture of drugs, receipts from the illegal sale of controlled substances, photographs of Howard Johnson, identification of Johnson who may also be involved in the manufacture of controlled substances.* [sic]

---

**3.** Section 5–301 of the Wilmington City Code provides:

Wilmington firefighters shall have all the powers conferred by statute and ordinance upon constables, sheriffs and state police of the State of Delaware. They shall have power to make lawful searches, seizures and arrests for violation of any statutes or ordinances in force in the city and all city parks,

to serve subpoenas when ordered to do so by their superior officers, and to do such other acts as may be required of them by statute or ordinance.

1 Wilm. C. (Charter) § 5–301 (1981). These are identical to the powers of police officers. *See* 1 Wilm. C. (Charter) § 5–201 (1981).

**4.** The search warrant is appended to this opinion as Exhibit A.

which are the instruments for and relating to the committing of a crime in violation of Title 16, Chapter 4752, Section _____ of the Delaware Revised Code of 1974. . . .

Defendant's Exhibit B (italics added—the italics indicate the words that were typewritten on the printed form). Defendant argues that sections (a) and (b) are so broad as to render the warrant a general warrant in violation of the fourth amendment. The government contends that the generality of these paragraphs is particularized by the typewritten language in section (c) and the printed language following section (c) which sets forth the specific offense.

The fourth amendment prohibits general warrants, requiring that a warrant particularly describe the place to be searched and the person or thing to be seized. *Andresen v. Maryland*, 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976). Nothing is to be left to the discretion of the police officer executing the warrant. *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927). Sections (a) and (b) standing alone are so broad as to authorize a search for anything related to any offense. There is no limitation of the search to evidence or fruit of any particular crime or crimes. *See United States v. Burch*, 432 F.Supp. 961, 962–63 (D.Del.1977), *aff'd*, 577 F.2d 729 (3d Cir. 1978). As one district court has recently noted in a similar case, such a warrant defeats the purpose of having a magistrate determine probable cause:

> To uphold the validity of this warrant would negate the purposes underlying a neutral probable cause determination. While the supporting affidavit appears sufficient to permit a finding of probable cause as to the categories of items described in the warrant, and the place where they may be found, it does not establish probable cause to search for evidence of an infinite variety of federal crimes. . . .

*United States v. Jacob*, 502 F.Supp. 1221, 1226 (D.Md.1980). Especially when the goods to be seized are not contraband, particularity of description is necessary to minimize the risk of an unlimited search. *United States v. Burch, supra*, at 963; *see, e. g., United States v. Abrams*, 615 F.2d 541 (1st Cir. 1980); *In re Application of Lafayette Academy, Inc.*, 610 F.2d 1 (1st Cir. 1979); *United States v. Giresi*, 488 F.Supp. 445 (D.N.J.1980).

The government argues, however, that sections (a) and (b) are limited by section (c), which describes various items to be seized, and the language immediately following, which reads "which are the instruments for and relating to the committing of a crime in violation of Title 16, Chapter 4752, Section _____ of the Delaware Revised Code of 1974. . . ." It is true that phrases in a search warrant may not be read in isolation, but should be read in context. *Andresen v. Maryland, supra*, 427 U.S. at 479–80, 96 S.Ct. at 2748–49. In this warrant, however, the context of the limiting section and language is ambiguous at best. Both sections (a) and (b) are followed by a semicolon, indicating that each stands alone. Section (c) ends with a period, but it is unclear whether the language following (c) is part of section (c) or modifies all three sections. In addition, the fact that the words "and/or" appear after the semicolon ending sections (a) and (b) indicates that each section was intended to be read independently and thus is not limited by the language following section (c). Moreover, both sections (a) and (b) refer to "a criminal offense," "a criminal perpetration," or "a crime," in contrast to the limiting language which specifically refers to "the committing of a crime in violation of" the appropriate statute.

The warrant upheld in *Andresen v. Maryland, supra*, differs significantly from the one at issue here. That warrant authorized seizure of "the following items pertaining to" a certain parcel of land in Maryland. This language was followed by a colon and then a lengthy list of specific items, ending with the phrase "showing or tending to show a fraudulent intent, and/or knowledge as elements of the crime of false pretenses, in violation of [the Maryland stat-

ute], *together with other fruits, instrumentalities and evidence of crime at this [time] unknown.*" 427 U.S. at 480 n.10, 96 S.Ct. at 2748 n.10 (emphasis added). The Supreme Court held that the challenged phrase, in italics above, referred only to the crime of false pretenses connected with the specified land, and this did not render the warrant illegally broad. *Id.* at 481–82, 96 S.Ct. at 2749. In this warrant, in contrast, the language setting out the crime is placed so ambiguously in the document as to render its meaning uncertain. Because of this ambiguity, it is likely that officers executing the warrant would be unable to determine from its face whether the search was limited to the stated crime.[5]

This search warrant constituted a general warrant in violation of the fourth amendment. The motion to suppress evidence obtained under this search warrant will be granted.

### III. Bill of Particulars

Defendant has also sought a bill of particulars pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure. He wishes to be informed of the approximate dates, times, and places of the overt acts that the government intends to prove at trial. The government opposes defendant's motion because there is no requirement that any overt acts be proven under the statutes in the indictment. *United States v. Dreyer*, 533 F.2d 112, 117 & n.6 (3d Cir. 1976).

■ The purpose of a bill of particulars is to inform the defendant of the nature of

the charges to enable him to prepare an adequate defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense. *United States v. Addonizio*, 451 F.2d 49, 63–64 (3d Cir.), *cert. denied*, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). The grant of a bill of particulars rests with the trial judge and will not be upset without a showing of an abuse of discretion. *United States v. Armocida*, 515 F.2d 49, 54 (3d Cir.), *cert. denied*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). Unless the defendant shows prejudice, no abuse of discretion will be found. *United States v. Addonizio, supra*, at 65.

■ The defendant of course is entitled to be informed of those central facts which will enable him to conduct his own investigation of the transactions giving rise to the charge. *United States v. Manetti*, 323 F.Supp. 683, 696 (D.Del.1971). Here the two-count indictment sufficiently informs the defendant of these facts. Count 1 advises the defendant of the dates between which the illegal conspiracy is alleged to have taken place, and Count 2 sets forth the specific date upon which the defendant is alleged to have possessed methamphetamine with intent to distribute.

Both parties agree that the government need not prove any overt acts under this indictment. It would be inappropriate here to require the government to specify overt acts that it may elect to prove at trial. *See United States v. Bixler*, Criminal Action No. 80–45 (D.Del. Nov. 5, 1980). The motion for a bill of particulars will be denied.

---

**5.** This likelihood is compounded by an apparent typographical error in the limiting phrase. The warrant reads "relating to the committing of a crime in violation of Title 16, Chapter 4752, Section _____ of the Delaware Revised Code of 1974." There is no Chapter 4752, but there is a section 4752 which appears to set forth the crime at issue. *See* Del.Code Ann.Health & Safety tit. 16 § 4752. Minor irregularities in an affidavit or warrant do not necessarily render them invalid. As one court recently noted:

Affidavits and warrants, which are frequently drafted under time pressure, often by po-

lice or persons without legal training, and which must frequently express complex thoughts, cannot properly be subjected to the same standards of discretion as might befit a criminal statute, an indictment, or a trust indenture.

*National City Trading Corp. v. United States*, 487 F.Supp. 1332, 1336 (S.D.N.Y.), *aff'd*, 635 F.2d 1020 (2d Cir. 1980). Nevertheless, in this warrant, where the language is already unclear, this error only compounds the ambiguity, by limiting the search to evidence of violation of a statutory chapter that does not exist.

208

APPENDIX

EXHIBIT A

IN·THE COUNTY OF NEWCASTLE
CITY OF WILMINGTON
STATE OF DELAWARE

IN THE MATTER OF HOWARD U. JOHNSON )
) SEARCH WARRANT AND RETURN
AND THE ENTIRE PREMESIS OF 712 E. 22nd St.) DAYTIME SEARCH
)
WILMINGTON,DELAWARE )
)
)
)
)
)

THE STATE OF DELAWARE TO: ___SGT. RONALD HUSTON & PTL. RICHARD ANDRESS___
and _____. being Police Officers of
the City of Wilmington, Delaware.

On this _14_ day of _JANUARY_, 1980, upon the annexed affidavit and appli-
cation or complaint for search warrant, made before me, _Alfred Frankowski_
and _____ which is incorporated herein by reference, having
found jurisdiction, I am satisfied that there is probable cause for a search
as set out in the affidavit of the premises known as _712 E. 22nd Street,_
_____, Wilmington, Delaware, and/or of the person(s) known as
___HOWARD U. JOHNSON_____
who operate and/or occupy said premises.
You are hereby ordered to search the above named place and/or person(s),
with the necessary and proper assistance within ten (10) days of the date
hereof, for the following evidence which is specified in the annexed affidavit
and application, to wit:

(a) paper, articles or things which are the instruments of a criminal
offense and/or designed and/or adapted and/or to be adapted to be used in a
criminal perpetration; and/or
(b) property obtained in the commission of a crime; and/or
(c) in particular, _papers that are pertinent in the use in preparing_
_chemicals to use in the manufacturing of illegal drugs,_
_receipts from the purchase of chemicals used in the illegal manufacture of_
_drugs, receipts from the illegal sale of controlled substances._
_photographs of Howard Johnson, identification of Johnson as well as_
_other associates of Johnson, who may also be involved in the manu-_
_facture of controlled substances._
_____
_____
_____

which are the instruments for and relating to the committing of a crime in
violation of Title _16_, Chapter _4752_, Section _____ of the Delaware Revised
Code of 1974, serving this warrant and making the search in the _day_ time, and
if the property be found there, to seize it, prepare a written inventory of the
property seized and bring the property before me, together with the person(s)
in whose custody of possession the same may be found, to be dealt with according
to law.

_Alfred Frankowski_
_____
Judge, MUNICIPAL Court
Wilmington, Delaware

IN THE COUNTY OF NEWCASTLE
CITY OF WILMINGTON
STATE OF DELAWARE

IN THE MATTER OF HOWARD U. JOHNSON )

AND THE ENTIRE PREMESIS OF 712 )
E. 22nd STREET,WILM. DE. )
                                 )   AFFIDAVIT AND APPLICATION
                                   )       FOR SEARCH WARRANT
                                   )
                                   )
                                   )

STATE OF DELAWARE   )
                      ) SS
NEW CASTLE COUNTY   )

On this 14 day of JANUARY , A.D. 19 80 before me,
_____ Judge of
Court of the City of Wilmington, New Castle County, State of Delaware, personally
appeared _____ SGT. RONALD HUSTON & PTL. RICHARD ANDRESS _____
and _____of the Wilmington
Bureau of Police who, being by me duly sworn, deposes and says that.

1. He, They has, have good reason to suspect and does, do suspect that within and
upon a certain place located within Wilmington Hundred, New Castle County, State of
Delaware, to wit: the place known as _712 E. 22nd Street,Wilm.,De._
_____and occupied by__ HOWARD U. JOHNSON ___
or any other person or persons, there has been and there is now located and concealed
therein certain property which may be concealed on the premises of said _premesis
_of 712 E. 22nd Street,Wilm.,De._
said property consisting of the following,
    (a)   paper, articles or things which are the instruments of a
          criminal offense and/or designed and/or adapted and/or
          to be adapted to be used in a criminal perpetration
          and/or
    (b)  property obtained in the commission of a crime; and/or
    (c)  in particular, _papers that are_ pertinent in the use in preparing
         chemicals to use in the . _manufacture of illegal controlled drugs,_
_receipts from the purchase of chemicals used in the illegal manufacture_
_of drugs, as well as receipts from the illegal sale of controlled sub-_
_stances, pictures of Johnson as well as pictures of other associates of_
_HOWARD JOHNSON, who may also be involved in the manufacture of controlled_
_substances._

2. The offense to which the above property and/or person (s) relate and which
affiant's believe to have been committed or is about to be committed, is the
crime of __ MANUFACTURE OF A SCHEDULE #2 CONTROLLED SUBSTANCE __
as set forth in Title_ 16 ___, Chapter_ 4752 ___, Section _____
Delaware Revised Code of 1974.

3. The facts tending to establish the grounds of this application or complaint and
the probable cause of affiant's suspicion that such facts exist, are as follows:

1) Members of the Drug, Organized Crime and Vice Division met with a confidential informant, during the week of 12 December 1980. This informant advised your affiant Ptl. Richard Andress that Howard U. Johnson also known as Calypso, was presently living at 712 E. 22nd Street, Wilmington. The informant further stated that Johnson is selling Methamphetamine from this location, and that the Methamphetamine that he sells is manufactured by Johnson, inside his home at 712 E. 22nd Street. The infor-

mant stated that Johnson had a clandestine laboratory in his house and that he personally was making the drugs.

2) Based on this information an investigation into the illegal drug activities of Howard U. Johnson, black male, D.O.B. 6–6–1936, was initiated.

3) A check was made by your affiants with the Federal Drug Enforcement AGENCY Agency, during the week of December 20, 1979, in regards to the illegal drug trafficking of Howard U. Johnson. It was learned from agents of the Drug Enforcement Agency that Johnson is considered by their agency to be of the highest echelon of illegal amphetamines dealers. It was also learned by your affiants from the DEA that Johnson is knowned by them to have purchased laboratoy equiptment and glassware, which could be used in the manufacture of drugs in June 1979.

4) On December 27, 1979, members of the Wilmington Department of Police responded along with the Wilmington Fire Department to 712 E. 22nd St. Wilmington, De.. Upon arrival at this location it was obvious that a fire had started in the house and that flames could be seen inside the house. After entering the house members of the Wilmington POLICE observed in plain view a large quantity of methamphetamine in the 2nd floor bedroom, And upon checking the cellar for fire, members of the Police Department observed in plain view a clandestine laboratory in the cellar, as well a large quantity of Chemicals also in the cellar.

5) That your affiants Sgt. Huston and Ptl. Andress were contacted by Sgt. Head of the Wilmington Police and advised to respond to this location to take custody of the drugs which were being guarded by members of the Department of Police. Upon arrival Sgt. Huston and Andress took custody of the illegal methamphetamine drugs as well as the clandestine laboratory, used in the manufacture of methamphetamine, and of the chemicals used to make the drug and the scales used to weigh the drug.

Your affiants while in 712 E. 22nd Street, observed pictures of Howard U. Johnson, throughout the house as well as papers in his name.

6) That a chemical field test of the methamphetamine taken from 712 E. 22nd Street, was made by Sgt. Huston. Said test had a positive reaction for methamphetamine.

7) That fingerprints were taken from the laboratory equipment and scales which were removed from 712 E. 22nd Street. A check of the fingerprints were made by Ptl. Roger Wilson, who has been qualified as an expert in Superior Court in Wilmington, De., and that a positive identification was made by Ptl. Wilson on a fingerprint lifted from a scale that was in the cellar along with the laboratory and chemical used in manufacturing drugs. This identification was made by Ptl. Wilson on January 11, 1980.

8) That your affiants have spoken to neighbors who live in the 700 block of E. 22nd Street. These neighbors stated that Howard Johnson was living at this home as late as the 26th of December 1980. They further stated that since the fire Johnson has not been seen at his home, and that no one else has come to the house to remove his personal belongings.

9) A check with the City of Wilmington Tax Department was made and the house is listed to Leroy Wilson at 712 E. 22nd Street

WHEREFORE your affiants pray that a search warrant may be issued for the person of Howard U. Johnson, and the entire premises of 712 E. 22nd Street, Wilmington, De. in a manner prescribed by law.

(s) Ronald M. Huston

AFFIANT, SGT. RONALD M. HUSTON

(s) Richard Andress

AFFIANT, PTL. RICHARD ANDRESS

(s) Alfred Fraczkowski

JUDGE, MUNICIPAL COURT, WILM., DE.

SWORN TO AND SUBSCRIBED BEFORE ME THIS 14 JANUARY, 1980 A.D.

RETURN

ON THE 14TH OF JANUARY 1980 AT APPROXIMATELY 2:00 P.M. MEMBERS

OF THE WILMINGTON DEPARTMENT OF POLICE VICE SQUAD EXECUTED THIS SEARCH WARRANT AS DIRECTED. AFTER KNOCKING ON THE FRONT DOOR THESE OFFICERS RECEIVED NO RESPONSE. THESE OFFICERS AGAIN KNOCKED AND ANNOUNCED THAT WE WERE THE POLICE, AND THAT WE HAD A SEARCH WARRANT. STILL RECEIVING NO RESPONSE THESE OFFICERS THEN GAINED ENTRY INTO THE DWELLING THROUGH A LIVINGROOM WINDOW WHICH WAS UNLOCKED. ONCE INSIDE THESE OFFICERS FOUND NO ONE INSIDE AND A SEARCH OF THE DWELLING WAS CONDUCTED AT WHICH TIME THE FOLLOWING ITEMS WERE SEIZED.

(1) GLASSINE BAG CONTAINING AN OFF WHITE POWDER WHICH WAS FIELD TESTED WITH POSITIVE RESULTS FOR METHAMPHETAMINE

NUMEROUS PAPERS WITH THE DEFENDANTS NAME ON SAME

NUMEROUS PICTURES SLIDES AND FILMS OF THE DEFENDANT

(1) BROWN SUITCASE

(1) STEEL PRESSURE COOKER

(1) STEEL CAN CONTAINING A UNKNOWN LIQUID

(1) GLASS BEAKER

SEVERAL CHEMICAL GAUGES, AND HOSES

Returned this 22nd day of Jan. 1982.

(s) Richard Andress

(s) Ronald M. Huston

(s) Alfred Fraczkowski
JUDGE MUNICIPAL COURT